# IN THE UNITED STATES BANKRUTPCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE : CHRISTIAN SCHOOLS, INC<br>D.B.A. TRINITY CHRISTIAN SCHOOL<br><br>Debtor | :<br>:<br>: | Case No: 09-02324<br>Chapter 11<br>Judge Flatley |

## MOTION OF FIFTH THIRD BANK FOR RELIEF FROM THE AUTOMATIC STAY

### MOTION

Fifth Third Bank ("Bank"), through counsel, moves this Court for an order granting the Bank relief from the automatic stay to take control of the real and personal property of the Christian Schools, Inc. ("Debtor") which is collateral security for the obligations owing by the Debtor to the Bank for cause as set forth in the accompanying memorandum.

STATMAN, HARRIS & EYRICH, LLC

By: /s/ Thomas R. Noland
Thomas R. Noland (0018239)
Patricia L Hill (0072595)
One Dayton Centre, Suite 900
1 South Main Street
Dayton, OH 45402
937-222-1090
937-222-1046 – fax
notices@statmanharris.com
Co-counsel for Fifth Third Bank

/s/James W. Martin, Jr.
James W. Martin, Jr.
Siegrist & White PLLC
P. O. Drawer 2550
Clarksburg, WV 26302
Co-counsel for Fifth Third Bank

### MEMORANDUM IN SUPPORT OF MOTION

#### STATEMENT OF FACTS

1. Debtor filed for relief under Chapter 11 on October 16, 2009 ("Petition Date"). Debtor listed the Bank as a secured creditor in Schedule D listing the Bank's collateral as "All real estate of school grounds and all personal property and account receivables".

2. Debtor listed in Schedule B as of Petition Date $581,228 in financial accounts; however, due to the call on the bonds, the $250,000 Debt Service Escrow account was set off before the filing. Debtor scheduled school furnishings at $500,000.00. Real estate listed in schedule A was valued at 2,413,000.00, and of that 2,300,000.00 was shown as 36 acres at Decker's creek ("School Site"), collateral of the Bank.

3. The School site was built in 2004 for a cost in excess of $9,000,000.00. The funds for the construction of the School Site came from bonds issued. The Bank issued a letter of credit for the protection of the holder of the obligation Debtor was to repay should Debtor fail to meet the terms for repayment of the bonds. The Debtor defaulted on the terms of payment on the bond obligations ("Note") and such default caused the indenture trustee for the bondholders to call the letter of credit which the Bank honored and paid the bondholders.

4. Debtor filed for relief shortly after the letter of credit was paid by the Bank. At the time of filing Debtor scheduled the amount due under the Note at $8,815,000.00.

5. Debtor and the Bank negotiated two interim cash collateral agreements in which Debtor was to pay no less than $10,500.00 per month for adequate protection. The Bank required in the second interim order entered February 12, 2010 [Docket 90] ("Second Interim Order"), in order for the Bank's continued consent of Debtor to use of cash collateral, that Debtor would employ a real estate broker should the Bank so request.

6. The attempts to have the Debtor obtain a broker were first raised on January 27, 2010, while the Order was still being drafted. Despite such request to the Debtor to recommend brokers, as of 2-18-2010 no response was made and a second request was made to counsel for the Debtor. The response was Mr. Shuman was leaving for 5 or 6 days as Mr. Shuman indicated a Perry Petroplus was the only qualified broker in the Morgantown area.

7. Without taking action on the broker the Debtor filed a motion on March 1, 2010 to determine the secured and unsecured claim of the Bank.

8. On March 3 the Bank demanded the Debtor comply with paragraph 3 of the Order was and immediately employ a broker indicating the Bank felt Mr. Castle of The Phoenix Group was also a qualified broker in Morgantown as well as Perry Petroplus and the Debtor should interview them and move to enter into a listing agreement by March 15, 2010.

9. On March 4, Mr. Shuman advised the Board was going to talk to Mr. Castle and Mr. Petroplus declined to be interviewed.

10. On 3-15-2010, Mr. Wiley indicated the Debtor would proceed with pursuing a listing agreement with Mr. Castle and a draft was circulated.

11. Mr. Castle has been unable to reach terms for the listing agreement that would pay him a commission should he find a buyer at a price above 3.5 million where the Debtor would elect to match the price of the offer to pay that amount to the Bank which would be indicative of the secured amount of the claim of the Bank.

12. On March 19, 2010 the Debtor was notified of this concern on the part of the broker and the Bank that would chill the broker's efforts to find a buyer. The broker had become aware of a potential buyer in Morgantown and was ready to propose a deal to the Buyer if he were engaged.

13. The response of the Debtor was the broker would be paid $1,500 in expenses if he found a buyer over 3.5 million and the school decided to match the offer.

14. Counsel called Mr. Shuman on March 19, 2010 re this $1,500 expense offer and Mr. Shuman said he would speak to the broker to negotiate on this issue. The broker was notified the same day that he should speak with Mr. Shuman on this issue.

15. On March 21, 2010 the broker indicated he felt that the Debtor would not properly compensate him and asked the Bank become involved in the listing agreement to protect him should he bring in an offer above the 3.5 million that the Debtor would match.

16. On March 23, 2010, counsel for the Bank contacted counsel for the Debtor and proposed the Bank be permitted to be a party to the listing agreement to provide protection for the commission of the broker based on full disclosure to the Court.

17. No response was forthcoming from the Debtor or counsel and on March 25, 2010, Bank's local counsel was asked to assist in preparing the filing of a motion to employ the broker as we did not hear from the Debtor.

18. Later the afternoon of March 25, 2010, a call was received from Mr. Shuman indicating the Debtor would agree to the Bank being on the listing agreement should the Bank compensate the Broker if the Debtor matched an offer price over $3.5 million.

19. On April 5, 2010, no filings to employ the Broker had been made and notice was given that a Motion to Prohibit Use of Cash Collateral was to be filed as the Debtor has defaulted on the Order. The Motion was filed April 8, 2010 [Docket # 108].

20. A hearing was held on April 23, 2010, wherein the Debtor agreed that Mr. Castle would be employed with the condition that he would not advertise the school locally for sale. The Court entered an order on May 3, 2010 [Docket 120], which permitted thirty days to get the order entered regarding continued use of cash collateral and employment of the Broker.

21. Counsel for the Bank provided draft orders to Debtor counsel on April 28,2010, see attached Exhibits " A" and " B" and a draft letter that was to be circulated to potential purchasers from the Bank, Exhibit " C".

22. No response was ever received from Debtor counsel regarding the drafts nevertheless an order was entered employing Mr. Castle was entered May 4, 2010 [Docket 121], which was never circulated to Bank counsel prior to its filing.

23. After the employment order was entered, Mr. Castle asked David Huffman of Fifth Third Bank to appear at the public school board meeting in Morgantown, which Mr. Huffman did. There was a reporter for the local news at the hearing and the reporter reported the school was for sale.

24. Despite having not responded to the draft orders provided on April 28, 2010, this reporter's article drew immediate response from the Debtor saying this violated the agreement reached in Court.

25. Mr. Castle had not advertised the school locally, but had only listed it on his internet site, which had to be accessed and was not advertised. He had not done any local advertising, which was the only limitation discussed and agreed upon at the Court hearing.

26. Despite the Court order of May 3, 2010, Debtor failed to respond to the draft orders provided on April 28, 2010 and the time passed for the entry of agreed orders as required by the Court.

**CAUSE FOR RELIEF**

27. The statutory provisions of 11 U.S.C. 362 (d) provide for relief from the automatic stay under both subsection (d) (1) and (d) (2).

28. Section (d) (1) provides for cause, including without limitation lack of adequate protection of the property in which the party seeking relief has an interest. This section provides a wide array of matters the Court may find that would permit grant of relief. Section (d) (2) provides additional requirements for relief when relief against property of the Debtor is sought.

29. Section (d) (2) requires proof that equity exists in the property and proof that the property is necessary for an <u>effective</u> reorganization (emphasis added). <u>United Savings Ass'n v. Timbers of Inwood Forest Assocs.</u>, 484 U.S. 365 (1988).

30. The burden of proof on all is other than equity in the property is on the Debtor. 11U.S.C. Section 362 (g). This presents the issue in this matter. Is the property of the Debtor secured to the Bank for payment of obligations owed, worth more than the obligations owing to the Bank.

31. Ironically the Debtor has represented to the Court the property secured to the Bank is not worth more than 3.2 million for the land and buildings and $500,000.00 for the personal property.

32. As discussed before the Court at the April 23rd hearing the disparity between Debtor's appraisal at 3.25 million and the Bank's at 8.9 million can best be reconciled through the listing process. If no buyer can be located, then the Court can determine the value in accordance with the Section 506 motion. Debtor now threatens to try to vacate the employment of the Broker or not compensate the Broker.

33. As further discussed at the April 23rd hearing, it was agreed that Mr. Castle would be compensated and employed subject to no doing local advertising. Despite having prepared draft orders to the Debtor for response, debtor has failed to respond or comply with the May 3, 2010 order of this Court.

34. The Bank is entitled to have the best efforts employed to obtain the best price possible on the land and buildings. The Debtor acknowledged that its fiduciary duty shifted from the owners to those of the creditors at the April 23, 2010 hearing, but the actions of the Debtor are purely for its self interests. Failure to appropriately exercise the Debtor's fiduciary duty is cause for

relief. The court in <u>American State Bank v. Grand Sports, Inc</u>., <u>86 B.R. 971 (Bankr. N.D. Ind. 1988)</u> though admitting that a debtor need not propose an actual reorganization plan to defeat a section 362(d)(2) motion for relief, held that "sincerity, honesty, willingness, and visionary promises will not support a conclusion that there is reasonable possibility of a successful reorganization." A number of other courts have used similar language to reject evidence of the debtor's motive as a significant area of inquiry in determining the feasibility of an **effective reorganization**. <u>North E. Fed. Sav. & Loan Ass'n v. Mikole Developers, Inc. (*In re Mikole Developers, Inc.*),</u> 14 B.R. 524, 527 (Bankr. E.D. Pa. 1981) ("Debtor's high hopes for reorganization or need alone for the property is not the sine qua non under section 362(d)(2).").

35. One can argue the Debtor is deliberately trying to delay the Broker, knowing the public school Board of Education may well decide it cannot wait as this uncertainty of whether the Trinity School will be sold exists. The Debtor has now turned the press to declare the building will not be sold and will be bought from the Bank.

36. The Debtor has now informed Bank counsel it may seek to have the Court rule on the 506 Motion, prior to any confirmation.

37. The reality of this Chapter 11 is that the Bank is the only significant creditor in this case and arguably this is a single asset real estate case. The Debtor is attempting to continue ownership of the School Site built at a cost of over 9 million in 2004 for an amount of 3.25 million. Debtor's projections in 2004 were that the school would be able to service over 8 million in debt; however, the enrollment figures anticipated were not reached. The physical facility itself has been well maintained.

38. The Debtor will not be able to obtain approval of the "Plan" without the consent of the Bank. In re Broad Assocs., L.P., 110 B.R. 632 (Bankr. D. Conn. 1990)," it is implicit . . . that the proposed plan must avoid statutory flaws that would prohibit confirmation".

39. There will be no affirmative vote of the Bank unless the Bank agrees to the treatment provided. Even if the Debtor can convince the Court there are other impaired classes other than the Bank, that have accepted the Plan treatment, this will get Debtor to the point of trying to argue the "cram down" provisions of Section 1129 (b). Debtor will be unable to met the requirements of Section 1129 (b) (A), (B) and (C) in short the "absolute priority rule" will prohibit confirmation.

40. For purposes of argument should the Court find the property is worth 3.25 million, this leaves approximately $4,768,000 in an unsecured claim. That amount of unsecured claim would dominate any other unsecured claims in addition to the fact that the Christian Schools, Inc. would not be paying senior classes in full and would be prohibited from receiving or retaining under the plan any property.

41. The Bank is entitled to relief under these circumstances. No effective reorganization has been proposed by the Plan filed by the Debtor. Such Plan cannot be confirmed if the Bank rejects the treatment provided for the Bank.

42. The Bank has been more than lenient in consenting to use of cash collateral, to allow the Debtor to explore the real value of the property secured to the Bank. Despite such leniency, Debtor has tried ever maneuvering to avoid having the market establish the value of the property and we are now eight months into the Chapter 11 proceeding without Debtor providing a Plan that could be confirmed. It is readily apparent that Debtor cannot present a plan that can be confirmed without the Bank's consent. The Bank has not sought relief for a reasonable period of time in order to give Debtor appropriate time to reorganize. The

exclusivity period has run, the plan filed cannot be confirmed, eight months have elapsed and the school year will end in June, it is doubtful Debtor can maintain the minimal adequate protection payment.

43. Since the Debtor has pursued tactics to prohibit the best means to establish the value of the property, so a fair price can be reached for the property, the Bank must seek relief from the automatic stay to gain control of the property and market it.

Respectfully Submitted

STATMAN, HARRIS & EYRICH LLC

/s/Thomas R. Noland
Thomas R. Noland (0018239)
Patricia L. Hill (0072595)
Darlene E. Fierle (0081217)
900 Fifth Third Center
1 S. Main Street
Dayton, OH 45402
937-222-1090
937-222-1046 fax
notices@statmanharris.com

/s/James W. Martin, Jr.
James W. Martin, Jr., Esq.
Siegrist & White PLLC
P. O. Drawer 2550
Clarksburg, WV 26302
(304) 624-6391
martinbk@westvirginia.net
Counsel for Fifth Third Bank

**Certificate of Service**

The undersigned herein certifies that a copy of this Motion Of Fifth Third Bank For Relief From The Automatic Stay was served through the bankruptcy electronic notification system on this 27th day of May 2010 upon the following creditor or parties in interest set forth in the attached Service List.

/s/ James W. Martin, Jr.

James W. Martin, Jr.

SERVICE LIST – E-Mail

Todd Johnson, Esq.
johnsonlawoffice@gmail.com

Michael V. Marlow, Esq.
West Virginia State Tax
michael.v.marlow@wv.gov

John F. Wiley, Esq.
JohnFWiley@aol.com

United States Trustee
Debra.A.Wertman@usdoj.gov